# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| KWANG I. LEE | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08-2242-DJW |
| | ) | |
| v. | ) | |
| | ) | |
| ORION MANAGEMENT | ) | |
| SOLUTIONS, INC. and | ) | |
| CITY OF LEAWOOD, KANSAS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant Orion Management Solutions, Inc.'s Third

Amended Motion for Summary Judgment (ECF No. 72). Defendant Orion Management Solutions,

Inc. ("Orion") asks the Court to enter summary judgment in its favor on Plaintiff's negligence claim.

For the reasons set forth below, the Motion is denied.

## I.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine

issue as to any material fact" and that it "is entitled to judgment as a matter of law."[1]  In applying

this standard, the court views the evidence and all reasonable inferences drawn from the evidence

in the light most favorable to the nonmoving party.[2]  "An issue is 'genuine' if there is sufficient

---

[1] Fed. R. Civ. P. 56(c)(2).

[2] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Hirase-Doi v. U.S. West Commc'ns, Inc.*, 61 F.3d 777, 781 (10th Cir. 1995)).

evidence on each side so that a rational trier of fact could resolve the issue either way."[3]  "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim."[4]

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[5]  In attempting to meet that standard, a moving party that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the moving party need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[6]  If the moving party carries this initial burden, the nonmoving party may not simply "rest upon his or her pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof."[7]  To accomplish this, "sufficient evidence [] pertinent to the material issue [] must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[8]

However, where "the moving party has the burden of proof, a more stringent summary judgment standard applies."[9]  "Thus, if the moving party bears the burden of proof, to obtain

---

[3] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[4] *Id.* (citing *Anderson*, 477 U.S. at 248).

[5] *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[6] *Id.* (citing *Celotex*, 477 U.S. at 325).

[7] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[8] *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002) (citations and quotations omitted).

[9] *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008)

summary judgment, it cannot force the nonmoving party to come forward with specific facts showing there is a genuine issue for trial merely by pointing to parts of the record that it believes illustrate the absence of a genuine issue of material fact."[10] "Instead, the moving party must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case."[11]

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[12]

Because jurisdiction over this matter is based on diversity of citizenship between the parties, the court will apply the substantive law of the forum state.[13]  The parties agree that Kansas law governs this dispute.  Thus, in resolving Orion's Motion, the Court will apply Kansas law.

## II.     BACKGROUND

Plaintiff, a resident of South Korea, was visiting his sister-in-law and brother-in-law, Michael Wellington ("Mr. Wellington"), in Leawood, Kansas in 2006.  While visiting, Plaintiff played golf at the Ironhorse Golf Club and practiced on the driving range.  Plaintiff brought this negligence action against Orion and Defendant City of Leawood, Kansas ("Leawood")  after suffering personal injuries while hitting golf balls on the Ironhorse Golf Club driving range on June 3, 2006.

---

[10] *Id.* (citations and quotations omitted).

[11] *Id.* (citations omitted).

[12] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1) (quotations omitted).

[13] *Thom*, 353 F.3d at 851 (citations omitted).

On the day of Plaintiff's accident, the Ironhorse driving range had two ropes that extended the entire width of the driving range, which delineated where golfers could hit. The ropes were on the ground and were secured by spherical tee markers with a height of approximately three to four inches. Plaintiff was hitting golf balls on the driving range while standing between the two ropes when a ball that he hit struck a spherical tee marker, bounced back, and struck Plaintiff in the left eye. Plaintiff contends that Orion and Leawood both owed Plaintiff a duty "to exercise a reasonable and ordinary degree of care in [] making the premises safe in the operation of the Ironhorse Golf Club."[14] Plaintiff further contends that Orion and Leawood breached this duty and he sustained damages as a direct result of Orion's and Leawood's negligence.

## III. FACTS

As an initial matter, the Court notes that Orion identifies nine new facts in its reply brief which Orion contends are uncontroverted. However, by inserting these facts for the first time in its reply brief, Orion has left Plaintiff without the opportunity to respond to Orion's claim that these additional facts are uncontroverted. The Court concludes that it is unfair to Plaintiff to consider these additional facts provided in Orion's reply brief because Plaintiff was not afforded the opportunity to respond to these facts.[15]

The Court finds that the following facts are uncontroverted or related in the light most favorable to Plaintiff, the nonmoving party.

---

[14] Pretrial Order (ECF No. 63) at ¶6(b)(1).

[15] *Oleson v. KMart Corp.*, 189 F.R.D. 636, 637 (D. Kan. 1999) ("Because the defendants' statement of uncontroverted facts generally appears for the first time in their reply brief, the court deems it unfair to the non-moving plaintiff to consider those facts to which he does not have an opportunity to respond.").

1.      Plaintiff is a resident of South Korea.

2.      Leawood is, and at all relevant times was, a municipal corporation organized and incorporated under the laws of the State of Kansas.

3.      Leawood is the owner of the Ironhorse Golf Club, a public golf course located in Leawood, Kansas.

4.      Orion is, and at all relevant times was, a corporation organized under the laws of the State of Kansas, and is engaged in the business of operating golf courses in general, and operates approximately four golf courses.

5.      Orion operated the Ironhorse Golf Club pursuant to an Agreement for Management of Ironhorse Golf Club (the "Agreement"), which Agreement was made and entered into by and between Leawood and Orion.

6.      The term of the Agreement began on November 1, 2003 and concluded on December 31, 2006.  A copy of the Agreement is attached to Orion's Motion as Exhibit 1.

7.      Christine L. Claxton ("Ms. Claxton") is employed by Leawood as the Director of Parks and Recreation Department of the City of Leawood.

8.      Ms. Claxton's job responsibilities include oversight of all of the recreational amenities, recreational programs, recreational facilities, parks, and the greenway system for Leawood.

9.      The day-to-day operation of the recreational amenities, facilities, and programs are managed by a recreation superintendent.

10.      The day-to-day operation of the parks and greenway system is managed by a parks superintendent.

11.     The day-to-day operation of the sole golf course owned by Leawood, the Ironhorse Golf Club, is managed by a private "outside" management company.

12.     With respect to the Ironhorse Golf Club, the management company performs the day-to-day operations and communicates with the Director of Parks and Recreation Department on an as necessary basis.

13.     After Orion proposed a budget, Ms. Claxton would meet with Orion and go through the budget, talking about both the maintenance side and operational side of the budget.

14.     Leawood also has a "Golf Committee," which is an advisory group to the City Council made up of citizens appointed by the mayor, along with two Leawood City Council liaisons. The Golf Committee makes recommendations to the City Council based on what may or may not come out of the meeting.

15.     The Leawood Golf Committee meets once a month and makes recommendations involving green fees, development around the golf course, issues with neighboring property owners, and reviews the management company's business plan.

16.     In 2006, Shane Gardner ("Mr. Gardner"), one of Orion's principals, was the general manager of the Ironhorse Golf Club.

17.     As general manager, Mr. Gardner was ultimately responsible for laying out the driving range.

18.     At all times relevant hereto, the Ironhorse driving range was set up in kind of a curved "T" format.  The back of the driving range had a section of concrete, artificial mats that were used during inclement weather.  The driving range also had a concave curved zoysia grass surface

that was approximately sixty to eighty yards wide and twenty to thirty yards deep, where golfers would hit during the summer.

19.     The Ironhorse driving range grass was mowed approximately three times a week and was maintained at a height of approximately 1/2 to 3/4 of an inch tall, or the same height as the Ironhorse golf course fairway grass.

20.     The Ironhorse driving range did not have individual hitting stations.

21.     The Ironhorse driving range had two ropes that extended the entire width of the driving range, which ropes delineated where golfers could hit.

22.     Golfers could hit golf balls on the Ironhorse driving range from anywhere within the roped off boundaries.

23.     The ropes on the Ironhorse driving range were moved pretty much every day in order to give the driving range grass a chance to recover from the wear it received during the course of a day.

24.     The ropes on the Ironhorse driving range were placed approximately eight to ten feet apart.

25.     The ropes on the Ironhorse driving range were anchored on each end by a spherical tee marker with a height and circumference of approximately three to four inches.

26.     A tee marker similar to the tee markers used on the Ironhorse driving range has been produced by Orion and was marked during the course of this matter as Deposition Exhibit No. 1.

27.     Four tee markers were used on the front rope, and four tee markers were used on the back rope.

28.     With each rope, there was a tee marker on each end, and two tee markers in the middle of the rope.

29.     Each tee marker was placed approximately the same distance apart.

30.     The tee markers used on the Ironhorse driving range were also used on the Ironhorse golf course as tee markers for special events.

31.     Mr. Gardner got the idea to use the tee markers to hold down the ropes on the Ironhorse driving range because he had seen tee markers used that way on other golf courses.

32.     Mr. Gardner acknowledged that it was possible a golf ball could strike one of the tee markers, but never thought a golf ball would strike the tee marker, bounce back, and hit someone on the driving range.

33.     Because of the way the tee markers were set up, with there only being two tee markers on the middle section of the rope, Mr. Gardner would never have imagined that somebody would hit balls close enough to one of the tee markers such that he or she could hit a tee marker and have the golf ball bounce back and hit someone.

34.     Before the subject accident, Mr. Gardner was not aware of any other golfer being injured by a golf ball hit off of a tee marker.

35.     Other than the subject accident, Gerald Pirkl ("Mr. Pirkl"), Plaintiff's designated expert, had never heard of a golfer who addressed a golf ball that subsequently struck a tee marker, which golf ball then struck the golfer who initially hit the ball.

36.     The tee markers used on the Ironhorse driving range are common in the golf industry.

37.     Plaintiff began golfing in 1997.

38.     Plaintiff was a single level handicap, and on a par 82 course, would typically score between 80 and 85.

39.     Plaintiff considered himself a "very good golfer."

40.     Plaintiff had been in Overland Park, Kansas for at least 25 days before the subject accident.

41.     Before June 3, 2006, Plaintiff played two rounds of golf at the Ironhorse Golf Club and he practiced at the Ironhorse Golf Club every day.

42.     Before June 3, 2006, Plaintiff had hit golf balls on the Ironhorse driving range.

43.     Before June 3, 2006, Plaintiff had hit golf balls while standing between two ropes on the Ironhorse driving range.

44.     On June 3, 2006, Plaintiff was hitting golf balls while standing between two ropes on the Ironhorse driving range.

45.     Plaintiff was positioned approximately halfway between the ropes at the time of the subject accident.

46.     Plaintiff was approximately one club length behind the front rope.

47.     The standard length of a driver is forty-six inches.

48.     Plaintiff was positioned approximately eight feet to the left of Mr. Wellington at the time of the subject accident.

49.     Plaintiff is a right-handed golfer.

50.     Plaintiff was four to five feet to the left of the subject tee marker at the time of the subject accident.

51.     Plaintiff was four to six feet from the subject tee marker that he struck at the time he addressed the golf ball, prior to his swing and prior to the subject accident.

52.     Plaintiff and Mr. Wellington were standing on the short cut of grass on the Ironhorse driving range at the time of the subject accident.

53.     Other than Plaintiff and Mr. Wellington, there was only one other person using the Ironhorse driving range at the time of the subject accident.

54.     Plaintiff could have picked any other spot on the Ironhorse driving range to hit golf balls.

55.     Upon arriving at the Ironhorse driving range with Mr. Wellington, Plaintiff took approximately 2/3 of the bucket of balls purchased at the driving range.

56.     Before the subject accident, Plaintiff and Mr. Wellington had been on the Ironhorse driving range for approximately one hour.

57.     Before the subject accident, Plaintiff hit approximately ten shots with his three wood.

58.     All of the approximately ten shots hit by Plaintiff with his three wood resulted in the golf ball going in its intended direction.

59.     Plaintiff hit his last three shots before the subject accident at the same target he was aiming for at the time of the subject accident.

60.     The subject accident occurred when Plaintiff struck the third from the last golf ball.

61.     On June 3, 2006, Plaintiff was using a three wood to hit golf balls while standing between two ropes being held down by spherical tee markers on the Ironhorse driving range, when a golf ball struck by Plaintiff hit a spherical tee marker located on the Ironhorse driving range.

62.     The golf ball Plaintiff hit while standing on the Ironhorse driving range, which golf ball then struck a spherical tee marker located on the same driving range, was not traveling in the direction Plaintiff intended it to travel at the time it hit the tee marker.

63.     Plaintiff believes he hit a "straight shot," but he "might have just shifted a little and then swung and . . . that's when it hit the – the yellow ball and ricocheted."

64.     Plaintiff acknowledged that a golf ball "usually sometimes does not go exactly where you want it to go."

65.     Before the subject accident, Plaintiff saw the ropes on the Ironhorse driving range.

66.     Before the subject accident, Plaintiff saw some of the tee markers on the Ironhorse driving range.  Plaintiff saw the tee markers on the side of the driving range, but he does not remember them being in the middle.

67.     At the time of the subject accident, Plaintiff "wasn't paying attention," and he "wasn't focusing on" the tee markers.

68.     Although Plaintiff "knew something was there," he did not know if the tee marker was yellow or some other color because he "just didn't focus on" it.

69.     Plaintiff "didn't really notice the yellow ball" because "[i]t wasn't obvious and it's not like [he] looked down."

70.     If Plaintiff had "seen the [tee marker], then [he] would have swung away from the [tee marker]."

71.     Before the subject accident, Mr. Wellington saw the tee marker Plaintiff hit on the Ironhorse driving range.

72.     The tee marker was visible for anyone who looked.

73. The tee marker was brightly colored.

74. Mr. Pirkl, Plaintiff's designated expert, believes Plaintiff could have seen the tee marker before the subject accident.

75. At the time of the subject accident, there were no obstructions on the driving range that would have precluded someone from seeing the tee marker.

76. At the time of the subject accident, there were no distractions that interrupted Plaintiff's swing on the occasion where he struck the ball that struck him in the eye.

77. Deposition Exhibit No. 9 is a drawing of the Ironhorse driving range created by Mr. Wellington a few days after the subject accident.

78. On June 21, 2006, a claims specialist for Orion's insurer went to the Ironhorse driving range and took a series of photographs depicting the Ironhorse driving range, the ropes on the Ironhorse driving range, and the tee markers that were securing the rope to the ground of the Ironhorse driving range, a color copy of which are attached to Orion's Motion as Exhibit 15.

79. Rule 11-1 of the United States Golf Association ("USGA") Rules of Golf states the following:

**11-1. Teeing**

When a player is putting a ball into play from the teeing ground, it must be played from within the teeing ground and from the surface of the ground or from a conforming tee in or on the surface of the ground.

For the purposes of this Rule, the surface of the ground includes an irregularity of surface (whether or not created by the player) and sand or other natural substance (whether or not placed by the player).

If a player makes a stroke at a ball on a non-conforming tee, or at a ball teed in a manner not permitted by this Rule, he is disqualified.

A player may stand outside the teeing ground to play a ball within it.

80.    The USGA Rules of Golf define the "teeing ground" as "the starting place for the hole to be played.  It is a rectangular area two club-lengths in depth, the front and the sides of which are defined by the outside limits of two tee-markers.  A ball is outside the teeing ground when all of it lies outside the teeing ground."

81.    Plaintiff was familiar with some of the rules of golf.

82.    Plaintiff had a booklet with the rules of golf in Korean.

83.    According to Plaintiff, the Korean Golf Association follows the USGA rules, and the rules of golf are universal.

84.    The "teeing ground" on Korean golf courses is similar to that on golf courses in the United States.

85.    There was no signage on the Ironhorse driving range to let golfers know where they were supposed to hit from.

86.    Jeffrey Brauer, Orion's expert, could name only one other golf course that used tee markers to hold down rope on the driving range, but stated that he had seen tee markers used to hold down ropes at driving ranges "dozens" of times.

87.    Cary Cozby, Orion's other expert, could not specifically name any other golf course that used tee markers to hold down rope on the driving range.

88.    Bounce back is a consideration in designing a golf course.

89.    Ground staples could have been used to tie off the ropes on the Ironhorse driving range.

90.    Orion was not an agent or employee of Leawood, and all of Orion's activities relating to Ironhorse were in Orion's capacity as an independent contractor to Leawood.

91. At the time of the subject accident, Orion was owned by its shareholders: Shane Gardner, Matt Roberts, Craig Spratlin, and their spouses.

92. Orion's Board of Directors included only Matt Roberts and Shane Gardner.

93. Plaintiff had never practiced at a driving range before Ironhorse that had tee markers holding down ropes.

94. The USGA rules of golf do not apply to driving ranges.

95. Mr. Pirkl has been involved in several cases involving personal injuries caused by ricocheting golf balls.

96. Mr. Pirkl testified that golfers typically tee off between tee markers when teeing off on a golf course.

## IV. DISCUSSION

The presence or absence of negligence is ordinarily a question of fact for the jury.[16] However, the issue of negligence "may be resolved by summary judgment where the facts of the case will support only one conclusion and reasonable minds could not differ as to that conclusion."[17] Orion argues that it is entitled to summary judgment on Plaintiff's negligence claim for several reasons, specifically that (1) Orion did not breach its duty of ordinary care by using spherical tee markers to hold down a rope on the Ironhorse driving range, (2) and even if Orion did breach its duty of ordinary care, the tee markers were an open and obvious danger for which Orion had no duty

---

[16] *Smith v. Locke Supply Co.*, No. 98-2495-JWL, 1999 WL 1423070, at *2 (D. Kan. Dec. 21, 1999).

[17] *Id.* (citing *Lay v. Kan. Dept. of Transp.*, 23 Kan.App.2d 211, 215 (Kan. Ct. App. 1996)).

to remove or warn Plaintiff, and (3) Orion is immune from liability under the recreational use exception to the Kansas Tort Claims Act. The Court will examine each of these arguments in turn.

### A.  Breach of Ordinary Care

Under Kansas law, in order to prevail on a negligence claim, "the plaintiff must prove the existence of a duty, breach of that duty, injury, and a causal connection between the duty breached and the injury suffered."[18] The first issue, the existence of a duty, is a question of law for the court.[19] The Court must therefore first determine whether Orion owes Plaintiff a duty and, if so, what duty Orion owes to Plaintiff.

"To hold a defendant liable for failure to keep premises in a reasonably safe condition, the defendant must be the owner, occupier, or possessor of the premises."[20] It is undisputed that Orion is not the owner of the Ironhorse Golf Club. However, Kansas courts, following the Restatement (Second) of Torts, have defined a "possessor of land," in part, as "one who is in occupation of the land with the intent to control it."[21] Orion, as the management company for the Ironhorse Golf Club at the time of Plaintiff's accident, acknowledges that it "possesse[d] Ironhorse pursuant to its Agreement to manage same."[22] Orion also acknowledges that Kansas courts have held, "One who does an act or carries on an activity upon land on behalf of the possessor is subject to the same

---

[18] *Elstun v. Spangles, Inc.*, 289 Kan. 754, 757 (Kan. 2009) (citations and quotations omitted).

[19] *McGee v. Chalfant*, 248 Kan. 434, 437 (Kan. 1991) (citations omitted).

[20] *Miller v. Zep Mfg. Co.*, 249 Kan. 34, 41 (Kan. 1991) (citations omitted).

[21] *Id.* at 42 (citing Restatement (Second) of Torts § 328E (1964)).

[22] Def. Orion Management Solutions, Inc.'s Third Am. Mot. for Summ. J. (ECF No. 72) at 28.

liability, and enjoys the same freedom from liability, for physical harm caused thereby to others upon and outside of the land as though he were the possessor of the land."[23]  The Court therefore concludes that regardless of whether Orion is considered a possessor of land or one carrying on an activity on behalf of the possessor of land, Orion is subject to the same liability and enjoys the same freedom of liability as that of the owner of the premises.

Under Kansas law, the owner of the premises owes a duty to exercise reasonable care to keep the premises safe and to warn a business invitee of concealed dangers which the owner knows of or should know of by exercising reasonable care.[24]  A business invitee is "a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land."[25]  Here, it is undisputed that the Ironhorse Golf Club is a public golf course and that Plaintiff was a patron of the golf course on the day of his accident.  The Court therefore concludes that Plaintiff is a "business invitee."  As a business invitee, the Court finds that Orion owed Plaintiff a duty to exercise reasonable care to keep the premises safe and to warn Plaintiff of concealed dangers which Orion knew of or should have known of by exercising reasonable care.  Thus, the Court concludes that the first element of negligence, the existence of a duty, has been demonstrated.

Orion claims it is entitled to summary judgment because Plaintiff cannot demonstrate the second element of negligence, that is, that Orion breached its duty of reasonable and ordinary care owed to Plaintiff.  Orion argues that it did not breach its duty because the use of the tee marker was

---

[23] *Lemon v. Busey*, 204 Kan. 119, 128 (Kan. 1969) (citations omitted).

[24] *Graham v. Loper Elec. Co.*, 192 Kan. 558, 561-62 (Kan. 1964) (citations omitted).

[25] *Seitz v. Lawrence Bank*, 36 Kan.App.2d 283, 293 (Kan. Ct. App. 2006) (quoting Restatement (Second) of Torts § 332 (1964)).

reasonable.  In support of this argument, Orion claims the tee marker at issue in this case is one of the most common tee markers used in the golf industry.  However, although it is uncontested that the tee markers used on the Ironhorse driving range are common in the *golf industry*, there is a question of fact as to whether these tee markers are commonly used on driving ranges.  Plaintiff argues that the tee marker at issue in this case is not commonly used to hold down a rope on a driving range.  In support of this argument, Plaintiff points out that Orion's expert, Jeffrey Brauer, could specifically name only one other golf course that used tee markers to hold down rope on the driving range.  Cary Cozby, Orion's other expert, could not specifically name any other golf course that used tee markers to hold down rope on the driving range.

Orion also points to the USGA rules as evidence that a signature characteristic of every golf course in the country are tee markers that identify where a golfer may tee off from on any given hole.  In addition, Orion relies on the USGA rules in support of its argument that Plaintiff was positioned within the "teeing ground," the same place he would have been had he been playing on the Ironhorse golf course.  Orion reasons that the use of the tee marker on the driving range did not subject Plaintiff to any hazard not inherent in the game of golf because the USGA rules specifically contemplate the use of two tee markers to identify the teeing ground on the golf course.  However, Orion admits that the USGA rules do not apply to driving ranges, which is where Plaintiff was hitting golf balls when his accident occurred.  Thus, there is still a question of fact as to whether the tee marker at issue in this case is commonly used on driving ranges, and whether its use on the driving range was reasonable.

Orion further argues that the use of the tee markers on the driving range was reasonable because the tee markers were serving several valuable purposes, including the following: (1) they

identified a narrow arrow for golfers to hit from, thereby ensuring that golfers were hitting from a safe place with respect to those golfers next to and near them on the driving range, (2) they were movable and therefore enabled golfers to hit from grass that was not completely worn, (3) they firmly secured the rope to the ground, thereby preventing wrist injuries to golfers who, in the course of a swing, may catch the head of the golf club on a loose rope, (4) they were visible so that golfers would not trip over the rope, and (5) they could be removed easily and could not be run over and ejected by a mower (a risk posed by using ground staples).

The Court concludes that although there may be several purposes for using the tee markers, that fact alone does not demonstrate that no reasonable minds could differ as to whether the use of the tee markers on the driving range was reasonable. Indeed, Plaintiff argues that ground staples could have been used in place of the tee markers, which is an uncontested fact in this case. It is also uncontested that bounce back is a consideration in designing a golf course, and that Mr. Gardner, the general manager of the Ironhorse Golf Club at the time of Plaintiff's accident, acknowledged that it was possible a golf ball could strike one of the tee markers, although he never thought a golf ball would strike the tee marker, bounce back, and hit someone on the driving range. The Court thus concludes that there remain genuine issues of material facts that preclude summary judgment based on Orion's first argument.

### B.    Open and Obvious Danger

Orion also argues that it is entitled to summary judgment because the tee markers were an "open and obvious" or "known and obvious" danger. As discussed above, under Kansas law, the owner of a business owes a business invitee a duty to exercise reasonable care to keep the premises safe and to warn an invitee of concealed dangers which the owner knows of or should know by the

exercise of reasonable care.[26]  However, generally speaking, " a possessor of land is under no duty to remove known and obvious dangers."[27]

Orion argues that Kansas courts use an objective test to determine whether a danger is "open and obvious."  In support of this argument, Orion relies on *Wellhausen v. University of Kansas*,[28] where the Kansas Court of Appeals relied on the Restatement (Second) of Torts § 343A, comment b (1964) in concluding that a possessor of land has "no obligation to protect against dangers of which the invitee/reasonable person knows or has reason to know."[29]  The Court notes that the Restatement (Second) of Torts also provides that the invitee must not only know of the condition itself, but rather must appreciate the danger it involves.[30]  In addition, the Court notes that there is an exception to the general rule that a possessor of land has no obligation to protect against open and obvious dangers, which the Kansas Supreme Court explained in *Miller v. Zep Manufacturing Co.,*[31] "However, the possessor may be under an affirmative duty to minimize the risk if there is reason to expect an invitee will be distracted, so that he or she will not discover what is obvious, will forget

---

[26] *Graham*, 192 Kan. at 561-62.

[27] *Miller*, 249 Kan. at 43 (citations omitted).

[28] 40 Kan.App.2d 102 (Kan. Ct. App. 2008).

[29] *Id.* at 106 (citing Restatement (Second) of Torts § 343A, comment b (1964)).

[30] Restatement (Second) of Torts § 343A, comment b (1965) ("The word 'known' denotes not only knowledge of the existence of the condition or activity itself, but also appreciation of the danger it involves.").

[31] 249 Kan. 34 (Kan. 1991).

what has been discovered, or will fail to protect against the danger."[32]  With these principles in mind, the Court turns to the facts in this case.

The Court concludes that regardless of whether an objective or subjective test is applied in determining whether the tee markers posed an open and obvious danger, there is a genuine dispute as to whether Plaintiff had actual knowledge of or should have known of the danger posed by the tee marker on the driving range.  As for Plaintiff's actual knowledge, there is a dispute as to whether Plaintiff saw the tee marker before his accident.  Before his accident, Plaintiff saw some of the tee markers on the driving range, but he does not appear to remember them being in the middle.  Plaintiff was not paying attention and did not focus on the tee markers and was not focusing on the tee markers.  Further, even if Plaintiff had seen the tee marker, it is not clear whether Plaintiff appreciated the *danger* posed by the tee marker before his accident.

In addition, the question of whether Plaintiff should have known of the danger posed by the tee markers is one for the jury.  It appears that Mr. Wellington saw the tee marker Plaintiff hit on the driving range and the tee marker was visible for anyone who looked.  However, Plaintiff hit golf balls for approximately one hour before his accident, all of the approximately ten shots hit by Plaintiff with his three wood resulted in the golf ball going in its intended direction, Plaintiff was not standing directly behind the tee marker but rather was standing four to five feet to the left of the tee marker at the time of his accident, and the tee marker had a height and circumference of only three to four inches.  Plaintiff argues that it was reasonable for him to believe he could safely hit golf balls anywhere between the ropes that delineated where golfers could hit from on the Ironhorse driving range.  Thus, it appears to the Court that there is a genuine dispute as to whether a

---

[32] *Id.* at 43 (citations omitted).

reasonable person should have known that the tee markers on the driving range posed a danger to Plaintiff.

Finally, even if the Court were to find that Plaintiff knew or should have known of the danger posed by the tee marker, there is a genuine dispute of fact as to whether Orion had an affirmative duty to minimize the risk posed by the tee marker because Orion should have expected that Plaintiff would have been distracted or forgotten of the danger posed by the tee markers. Orion argues that it is undisputed that Plaintiff was not distracted at the time of the subject accident. However, the evidence does not support this broad statement. Rather, Plaintiff testified that, at the time of his accident, there were no distractions that interrupted Plaintiff's *swing* on the occasion where he struck the ball that struck him in the eye. Plaintiff argues that he was concentrating on his golf swing and the flying path of his ball and therefore was not focusing on the tee markers. Plaintiff further argues that Orion had reason to expect that golfers might be distracted by picking out golf clubs, teeing balls, swinging clubs, or even talking with companions. Thus, the Court concludes that there are genuine issues of material fact as to whether Plaintiff was distracted or forgot of the danger posed by the tee markers on the driving range.

The Court finds that there are genuine issues of material facts which preclude summary judgment based on Orion's second argument.

## C. Recreational Use Exception

Orion's final argument in support of its Motion is that it is entitled to immunity under the Kansas Tort Claims Act. Under the Kansas Tort Claims Act, unless an exception applies, a "*governmental entity* shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances

where the governmental entity, if a private person, would be liable under the laws of [Kansas]."[33]

"In order to avoid liability, the governmental entity has the burden of proving that it falls within one

of the enumerated exceptions found"[34] in the Kansas Tort Claims Act.

Orion relies on the recreational use exception of the Kansas Tort Claims Act, which

provides,

> *A governmental entity* or an employee acting within the scope of the employee's
> employment shall not be liable for damages resulting from: . . .
> (o) any claim for injuries resulting from the use of any public property intended or
> permitted to be used as a park, playground or open area for recreational purposes,
> unless the governmental entity or an employee thereof is guilty of gross and wanton
> negligence proximately causing such injury.[35]

The Kansas Supreme Court has explained the policy and purpose behind the recreational use

exception as follows:

> The purpose of [the recreational use exception] is to provide immunity to a
> *governmental entity* when it might normally be liable for damages which are the
> result of ordinary negligence. This encourages governmental entities to build
> recreational facilities for the benefit of the public without fear that they will be
> unable to fund them because of the high cost of litigation. The benefit to the public
> is enormous. The public benefits from having facilities in which to play such
> recreational activities as basketball, softball, or football, often at a minimal cost and
> sometimes at no cost. The public benefits from having a place to meet with others
> in its community.[36]

---

[33] K.S.A. 75-6103(a) (emphasis added).

[34] *Poston v. Unified Sch. Dist. No. 387, Altoona-Midway, Wilson Cnty.*, 286 Kan. 809,
812 (Kan. 2008) (citations omitted).

[35] K.S.A. 75-6104(o) (emphasis added).

[36] *Poston*, 286 Kan. at 812-13 (quotations and citations omitted) (emphasis added).

Under the Kansas Tort Claims Act, "governmental liability is the rule and immunity is the exception."[37]

Because Orion bears the burden of demonstrating that the recreational use exception provides Orion with immunity to Plaintiff's claim,[38] Orion must do more than demonstrate the absence of a genuine issue of material fact. Instead, Orion must establish, as a matter of law, all essential elements of the recreational use exception before Plaintiff is obligated to bring forward any specific facts alleged to rebut Orion's claim of immunity under the exception.[39] As an initial matter, Orion must demonstrate that it is a governmental entity under the Kansas Tort Claims Act and therefore entitled to benefit from the recreational use exception.

The Kansas Tort Claims Act defines governmental entity as a state or municipality.[40] A "municipality" is "means any county, township, city, school district or other political or taxing subdivision of the state, or any agency, authority, institution or other *instrumentality* thereof."[41] It is undisputed that Leawood, the owner of the Ironhorse Golf Club, is a municipality. Orion argues that it is an instrumentality of Leawood and therefore should be considered a governmental entity under the Kansas Tort Claims Action. The Kansas Tort Claims Act does not define an "instrumentality" of a municipality.

---

[37] *Jackson v. Unified Sch. Dist. 259, Sedgwick Cnty.*, 268 Kan. 319, 322 (Kan. 2000).

[38] *Poston*, 286 Kan. at 812.

[39] *Pelt*, 539 F.3d at 1280.

[40] KSA 75-6102(c).

[41] KSA 75-6102(b) (emphasis added).

In support of its argument that it is an instrumentality of a municipality, Orion relies heavily on the Kansas Court of Appeal's decision in *Lane v. Atchison Heritage Conference Center, Inc.*,[42] where the court examined the issue of whether the Atchison Heritage Conference Center, Inc. ("AHCC") was an instrumentality of the City of Atchison. In *Lane*, it was undisputed that the City of Atchison purchased a conference center using federal block grants. The purpose for buying the conference center was to attract groups to the Atchison area. AHCC was then "incorporated to manage the conference center and administer the center's services through a year-to-year lease from the City of Atchison."[43] In addition, AHCC was "a wholly-owned subsidiary of the Atchison Area Economic Development Corporation, and, by the terms of its lease with the City of Atchison, all gross revenue generated by the operation of the conference center [was] paid to Atchison for 'economic development.'"[44] In addition, "[t]he Board of AHCC consist[ed] of nine members, including a representative from the Atchison City Commission and the Atchison Area Economic Development Corporation, five members of the Atchison community at large, the City Manager of Atchison, and the President of the Atchison Chamber of Commerce."[45] The *Lane* court concluded that AHCC was an instrumentality of a municipality. In so concluding, the court noted that AHCC was substantially controlled by the City of Atchison through the terms of its annual lease, through the Board of AHCC, and through the control over capital improvement funds for the conference center facilities.

---

[42] 35 Kan.App.2d 838 (Kan. Ct. App. 2006), *rev'd on other grounds by, Lane v. Atchison Heritage Conference Center, Inc.*, 283 Kan. 439 (Kan. 2007).

[43] *Id.* at 840.

[44] *Id.*

[45] *Id.*

The *Lane* court also looked to other Kansas cases to support its conclusion. For example, in *Gragg v. Wichita State University*,[46] the Kansas Supreme Court first concluded that the definition of "state" in the Kansas Tort Claims Act included state universities, such as the defendant Wichita State University. The *Gragg* court then went on to conclude that the Wichita State University Intercollegiate Athletic Association, Inc. (the "Athletic Association"), an affiliate of the university, was a governmental agency because the Athletic Association was an integral part of the university, it was controlled and operated by university employees, and it enjoyed the same privileges as the university.

The Court finds both the *Lane* case and the *Gragg* case particularly instructive in its analysis of whether Orion is an instrumentality of Leawood. Based on these cases, the Court concludes that it must consider the amount of control that Leawood exercised over Orion or whether Orion was an integral part of Leawood in determining whether Orion is an instrumentality of Leawood. Having considered Orion's arguments, the undisputed facts, and the relevant law, the Court concludes that Orion has not met its burden of proving that it is an instrumentality of Leawood.

Unlike AHCC in the *Lane* case, Orion was not incorporated for the purpose of managing the Ironhorse Golf Club, it is not a wholly-owned subsidiary of a Leawood affiliated corporation, its purpose is not the economic development of Leawood, and its Board of Directors is not comprised of representatives of Leawood. Rather, Orion is a private "outside" management company which is engaged in the business of operating golf courses in general and operates approximately four golf courses, not just the Ironhorse Golf Club, Orion was paid a monthly management fee for its management services, Orion was owned by its shareholders: Shane Gardner, Matt Roberts, Craig

---

[46] 261 Kan. 1037 (Kan. 1997).

Spratlin, and their spouses, and Orion's Board of Directors included only Matt Roberts and Shane Gardner, who are not employees of or otherwise affiliated with Leawood. Although there is a Golf Committee, an advisory group *to the City Council* made up of citizens appointed by the mayor and two Leawood City Council liaisons, there is no evidence that the Golf Committee advised or controled Orion.

Furthermore, it is undisputed that Orion managed the day-to-day operation of the Ironhorse Golf Club and communicated with Ms. Claxton, the Director of Parks and Recreation Department, on an as necessary basis. Pursuant to the Agreement between Orion and Leawood governing the management of the Ironhorse Golf Club, Orion was responsible for collecting and disbursing all monies, employment of all employees, promotion and management of the golf course, purchasing and selling wine, beer, and liquor, staffing for sales on behalf of Leawood for food, non-alcoholic beverages, merchandise and services, purchasing and maintaining insurance coverage, handling disputes with third-parties, collecting and paying all applicable taxes, securing all appropriate licenses and permits, and performing all other day-to-day activities for the Ironhorse Golf Club. Although it appears that Leawood maintained some control over the Ironhorse Golf Club, such as control over major decisions, including capital improvements and expenditures and the annual budgets, and the ability to review transaction activity on the accounts held by Orion for Leawood, the Court concludes that this control is not sufficient to deem Orion an instrumentality of Leawood.

Moreover, unlike the Athletic Association in *Gragg*, there is no evidence that Orion was an integral part of Leawood. Rather, the Agreement demonstrates that the relationship between Orion and Leawood was intended to be a separate and independent relationship:

> The relationship between [Leawood] and Orion shall be and at all times remain that of owner and independent contractor, respectively. Neither [Leawood] nor Orion

shall be construed to be held to be a partner, limited partner, associate or agent of the other, or be joint venturers with one another.  Neither [Leawood] nor Orion shall be authorized by the other to contract any debt, liability or obligation for or on behalf of the other.[47]

The Court therefore concludes that Orion is not an instrumentality of Leawood and therefore is not a governmental entity under the Kansas Tort Claims Act.  Consequently, the Court holds that the recreational use exception is not applicable to Plaintiff's claim against Orion.

## V.    CONCLUSION

For the reasons set forth above Defendant Orion Management Solutions, Inc.'s Third Amended Motion for Summary Judgment (ECF No. 72) is denied.

**IT IS THEREFORE ORDERED** that Defendant Orion Management Solutions, Inc.'s Third Amended Motion for Summary Judgment (ECF No. 72) is denied.

**IT IS SO ORDERED**.

Dated in Kansas City, Kansas on this 8th day of October, 2010.

s/David J. Waxse
David J. Waxse
U.S. Magistrate Judge

cc:    All counsel and *pro se* parties

---

[47]Agreement For The Management of Ironhorse Golf Club, attached as Ex. 1 to Def. Orion Management Solutions, Inc.'s Third Am. Mot. for Summ. J. (ECF No. 72).